IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| ON SITE PERSONNEL, LLC, | * | |
| | * | |
| v. | * | Civil No. JFM-13-03700 |
| | * | |
| C-CARE, LLC, et al. | * | |
| | * | |

****** 

## MEMORANDUM

Plaintiff On Site Personnel, LLC ("On Site") brings this lawsuit against Defendants C-Care, LLC ("C-Care"); Affable Services, LLC ("Affable"); and their respective Presidents: Ullrich Metzler and Sonam Kunga. On Site alleges three claims against C-Care under Maryland law: breach of contract, fraudulent inducement, and unjust enrichment. On Site also alleges that Affable, Metzler, and Kunga tortiously interfered with the contract between On Site and C-Care. On Site seeks monetary and injunctive relief. Pending is a motion for summary judgment filed by C-Care and Metzler only ("defendants"). (ECF No. 48). The motion is fully briefed, and a hearing was held on April 30, 2015. For the reasons set forth below, defendants' motion for summary judgment is granted.

## BACKGROUND

C-Care is "a contract manufacturer for hair care, hair color, [and] skin care" products who contracts with temporary staffing companies that provide workers to package, pack, and warehouse C-Care's products. (ECF No. 50-1 at 16:7–18). As of early 2011 C-Care had contracts with two temporary staffing companies: PSI Personnel, LLC ("PSI") and Affable. (ECF No. 50-2 at 10:7–12; 13:13–14). Each provided about half of C-Care's temporary staffing needs. The relationship between C-Care and PSI soured toward the end of 2011, and Plaintiff

On Site, another temporary staffing services company, replaced PSI.  (ECF No. 48-5 at 16).  Due to a dispute over payments, PSI filed a lawsuit against C-Care and On Site in 2012 that was settled in April 2013.  (ECF No. 50-3 at 19:5–7).  To finance the settlement with PSI, On Site provided $150,000.  (*Id.* at 28:13–21).  In exchange for that payment C-Care promised to, and then did, contract with On Site in April 2013 to continue providing temporary staffing services ("The Agreement").  (ECF No. 48-8).  The Agreement was for two years (with an automatic renewal absent notice by either party) and specified that On Site had "the exclusive opportunity to refer and place fifty percent (50%) of C-Care's needs for temporary staff."  (*Id.* at ¶ 1.b.).  As for payment, the Agreement required On Site to warrant that its rates "not exceed the lesser of . . . (ii) the rates for staffing services that C-Care pays other staffing services."  (*Id.* at ¶ 7.a).  Addendum A to the Agreement contained the hourly rates for various service staff categories that On Site would charge C-Care.

During that time, Affable provided the other half of C-Care's temporary staffing needs.  The two companies signed a contract on August 22, 2011 that was similar to the Agreement between On Site and C-Care except for one notable difference: Affable was not obligated to match a lower rate charged to C-Care by another competitor.  (ECF No. 48-7).  Sonam Kunga founded Affable in 2011, and states that he is the only person who has ever owned any part of Affable.  (ECF No. 48-11 at 25:18–26:12).  On Site disputes Kunga's testimony, arguing that other evidence demonstrates ownership or control of Affable by Ullrich Metzler, the President of C-Care.  (ECF Nos. 50-13, 50-14, 50-15).  Metzler denies any ownership or control, but admits that he met Kunga prior to Affable's founding while Kunga was working for PSI on a project at Metzler's home.  (ECF No. 50-2 at 18:1–17).

In June 2013, Metzler and Andy Davis—C-Care's vice president of finance and administration—met with On Site President "Paul" Nguyen to inform him that C-Care was being charged lower rates by a different temporary staffing service, and that On Site would need to match those rates pursuant to the Agreement. (ECF Nos. 50-7 at 20:3–12; 50-6). Although C-Care's counsel stated at the time that it was "*now* able to procure other staffing services at rates below that On Site is charging C-Care," (emphasis added), Metzler and Davis admit that Affable was charging those lower rates since 2011. (ECF Nos. 50-8; 50-2 at 28:18–32:1). In response to being informed of the lower rates requested by C-Care, On Site's Nguyen stated he would be unable to comply because it would prevent him from breaking even after paying necessary expenses and taxes. (ECF No. 48-5 at 87:4–19) ("I mean, it's not feasible . . . I don't want it."). C-Care provided the following documentation in August 2013 as evidence of the lower rates charged by Affable: an August 18, 2013 invoice; redacted timesheets; and a handwritten check stub. (ECF No. 50-11). On Site deemed those documents insufficient, and requested a copy of the contract between Affable and C-Care in addition to asking other questions aimed at the true relationship between Affable and C-Care. (ECF No. 50-16).

After negotiations between the parties ended, C-Care deemed On Site to be in breach of the Agreement as of September 4, 2013 because it was not matching the lower rates charged by Affable. (ECF No. 50-11). C-Care continued to use On Site for staffing, however, until the end of 2013 to ensure continuity of operations. (ECF No. 50-2 at 61:10–12). As of early 2014, Affable was able to provide additional temporary staff to compensate for the loss of On Site.

On Site filed a complaint on December 6, 2013, and an amended complaint on January 27, 2014 against Affable, Kunga, On Site, and Metzler. (ECF Nos. 1, 26). C-Care filed a

counterclaim against On Site on February 10, 2014.  (ECF No. 29).  C-Care and Metzler filed the pending motion for summary judgment on November 26, 2014.  (ECF No. 48).

## STANDARD

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P 56(a); *Celotex Corp v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When reviewing a motion for summary judgment, the court must look at the facts and inferences drawn from there in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Although the moving party bears the burden to demonstrate the absence of any genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), the non-moving party may not merely rest upon allegations or denials in pleadings, but must, by affidavit or other evidentiary showing, set out specific facts showing a genuine issue remains for trial.  Fed. R. 5 Civ. P. 56(c)(1)(A).  A court should enter summary judgment where a non-moving party fails to make a sufficient showing to establish the elements essential to the party's claim and on which the party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.

If there is insufficient evidence for a reasonable jury to render a verdict in favor of the non-moving party, there is no genuine issue of material fact, and summary judgment may be granted.  *See Anderson*, 477 U.S. at 248.  The court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003).  Conversely, the motion should

be denied if factual issues exist "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## ANALYSIS

**I.   Claims against C-Care.**

On Site's amended complaint contains three counts against C-Care: breach of contract (Count I), fraudulent inducement (Count III), and unjust enrichment (Count IV).  Each is discussed in turn.

### A.  Breach of Contract.

Breach of contract claims are often fact-bound and unsuited for summary judgment. *Weaver v. ZeniMax Media, Inc.*, 923 A.2d 1032, 1051 (Md. 2007).  If the facts are undisputed, however, a court must "decide whether those facts constitute a breach of the contract." *Id.*  Here, On Site claims there are at least two material factual disputes: C-Care's knowledge of Affable's rates when it signed the Agreement with On Site, and the validity of C-Care's documentation to prove Affable's rates.  After reviewing the evidence, I conclude that there are no genuine disputes over these material facts, and C-Care is entitled to summary judgment.

#### 1.   C-Care's knowledge of Affable's rates is not bad faith.

Before addressing On Site's bad faith allegation, the relevant portions of the Agreement must be interpreted.  Under Maryland law contracts are interpreted objectively, with effect being given "to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean." *Clancy v. King*, 954 A.2d 1092, 1101 (Md. 2008) (internal quotation marks omitted).  Courts interpret a contract based "on the four corners of the agreement." *Id.* (quoting *Cochran v. Norkunas*, 919 A.2d 700, 710 (Md. 2007)).  The dispute in this case centers on one paragraph of the Agreement—7.a.  It states that "On Site shall charge C-

Care competitive rates for Staffing services which *On Site warrants shall not exceed the lesser of* . . . (ii) the rates for staffing services that C-Care pays other staffing services." (ECF No. 48-8 at p. 2) (emphasis added).  Contrary to Nguyen's interpretation of that provision and On Site's arguments in its brief, the plain language imposes a duty on On Site to not charge C-Care higher rates than do other temporary staffing services at any point for the duration of the contract.  The next line of paragraph 7.a states "Addendum A shall be used to determine the agreed-upon hourly billing rates," but that sentence is best interpreted as setting the initial rates that On Site would charge.  Both clauses are complementary, in that Addendum A sets the initial baseline rates and On Site warrants that it will not charge higher rates than C-Care pays other staffing services.  Paragraph 7.a, therefore, justifies C-Care's request for Nguyen to match Affable's rates, which he refused to do.

On Site admits it refused to match the lower rates pursuant to paragraph 7.a, but argues C-Care could not invoke 7.a because it acted in bad faith.  There is evidence that several C-Care agents, including Metzler, knew that Affable was charging lower rates when the Agreement (with the higher rates in Addendum A) was signed.  (ECF Nos. 50-2 at 33:14–22, 50-7 at 12:3– 13:6).  The knowledge of Metzler and Davis is imputed to C-Care because a corporation acts through its agents and "the knowledge of the agent is knowledge of the principal." *Anderson v. Gen. Cas. Ins. Co.*, 935 A.2d 746, 753 (Md. 2007) (internal quotation marks omitted); *see also Hecht v. Resolution Trust Corp.*, 635 A.2d 394, 405 (Md. 1994).  These facts are undisputed, but On Site has not cited a legal foundation to justify its argument that C-Care's knowledge was bad faith excusing On Site from complying with Paragraph 7.a.  Instead, the facts show an arms-length negotiation between businessmen that resulted in a contract with a provision clearly benefitting C-Care.  It is not bad faith for a party to negotiate favorable terms, and then expect

the other party to abide by those terms.  Accordingly, C-Care's knowledge that Affable charged

lower rates does not excuse On Site from meeting its obligations under the Agreement.

## 2. C-Care's documentation of Affable's rates is undisputed.

On Site's second argument is that there are disputed facts regarding the validity of

Affable's rates.  On Site supports this argument in two ways: by attacking the quality and

quantity of documentation provided by C-Care, and by accusing Metzler of having ownership

and/or control over Affable.  Neither are sufficient to defeat C-Care's motion for summary

judgment on the breach of contract count.

First, On Site claims that C-Care failed to provide adequate documentation of Affable's

rates.  C-Care clearly did not provide much, but it did send copies of an August 18, 2013 invoice

from Affable, redacted timesheets, and a handwritten check stub.  (ECF No. 50-11).  The invoice

is corroborated by the contents of a June 21, 2013 email sent by Metzler in which he confirmed

Affable's rates that C-Care was going to present to Nguyen.  For example, the June 21 email

listed $11.75 as the hourly rate for packers, and $15.50 as the hourly rate for operators.  (ECF

No. 50-6).  Those rates are identical to those charged by Affable on the August 19, 2013 invoice.

(ECF No. 50-11 at p. 3).  On Site has not cited any evidence in response, except for Nguyen's

testimony that he believed Affable's rates were not legitimate because they were not "feasible,"

meaning that Nguyen could not charge those rates while complying with legal obligations like

paying taxes and insurance premiums.  (ECF No. 48-5 at 87:2–19).  That belief is insufficient to

genuinely dispute the documents' validity.[1]

Second, On Site alleges that Metzler had some role in creating, owning, or operating

Affable.  It cites several documents to support this claim, including a text from C-Care's Kevin

---

[1] Moreover, at the April 30, 2015 hearing, On Site's counsel admitted it was no longer disputed
that C-Care was paying Affable the rates listed in the invoice.

Miller to Nguyen in which Miller stated "I am sure [Metzler] owns Affable," (ECF No. 50-12 at

p. 5); and the recollection by On Site employee Francis Lee of a prior conversation with Kunga,

who stated that Metzler owned Affable.  (ECF No. 50-15).  Both pieces are evidence are

disputed, however, by Miller's and Kunga's depositions.[2]  Rather than parse whether this dispute

is genuine, it is sufficient to say that it is not material to On Site's breach of contract claim.  Even

if Metzler was involved in some way with Affable, On Site alleges that *C-Care* breached the

Agreement, and there is no evidence that C-Care as an entity had any ownership in or control

over Affable.

In conclusion, On Site has not cited sufficient evidence to genuinely dispute material

facts that it must prove at trial.  Because no reasonable jury could find otherwise, summary

judgment on Count I of the amended complaint is granted in C-Care's favor.

**B. Fraudulent Inducement.**

On Site also alleges that C-Care fraudulently induced On Site to pay $150,000 to settle

PSI's lawsuit.  The record shows that both parties understood that payment to be in exchange for

a two-year contract to provide half of C-Care's staffing needs.  The Agreement reflects that

understanding, but On Site now alleges that C-Care's plan from the beginning was "to terminate

the [contract] for bogus reasons and replace On Site with Affable." (ECF No. 26 ¶ 36).  Because

On Site has not cited sufficient evidence to support its burden in proving this claim, C-Care's

motion for summary judgment as to this count is granted.

Under Maryland law, a plaintiff alleging fraudulent inducement must prove the following

elements by clear and convincing evidence:

---

[2] It is unclear whether Lee's letter documenting a conversation with Kunga from several months
prior is admissible evidence against C-Care or Metzler.

> (1) that the defendant made a false representation to the plaintiff, (2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Md. Envtl. Trust v. Gaynor*, 803 A.2d 512, 516 (Md. 2002).  Also relevant to this case is that "Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party" absent a fiduciary or confidential relationship.  *Id.* at 516–17.  Here, On Site has not cited evidence that proves by clear and convincing evidence the first prong—a false representation made by C-Care.

At least two facts are undisputed.  First, the Agreement was signed by C-Care in return for On Site's payment of $150,000 to settle PSI's lawsuit.  Second, both parties operated under the Agreement without complaint for several months, up until Metzler decided to ask On Site to match Affable's lower rates pursuant to paragraph 7.a of the Agreement.  There is no evidence, however, that C-Care harbored a fraudulent intent during its discussions with On Site that culminated in the $150,000 payment and Agreement.[3]  Although several C-Care employees, including Metzler, have admitted that they were aware of the lower rates charged by Affable when they negotiated with On Site, neither C-Care or its agents had a legal obligation to volunteer Affable's rates.  That knowledge by itself, therefore, is not actionable fraud.  C-Care must further prove that someone from C-Care affirmatively misrepresented material facts, which it does not.

---

[3] On Site notes a letter from C-Care's counsel in which he stated that "C-Care is *now* able to procure other staffing service at rates below what On Site is charging C-Care."  (ECF No. 50-8) (emphasis added).  On Site claims his use of "now" is false, since Affable was charging the same lower rates when C-Care contracted with On Site in April 2013.  On Site is correct, but this letter from counsel does not reflect C-Care's intent when it negotiated the $150,000 payment and Agreement with On Site.

On Site claims that it relied "upon C-Care's representations as to the rates it would be paid in exchange for the settlement program," which On Site alleges turned out to be false.  (ECF No. 50 at p. 13).  This refers to the rates listed in Addendum A of the Agreement, which On Site paid C-Care until C-Care requested under paragraph 7.a that On Site match Affable's rates. Nothing in the record establishes, however, that C-Care promised to pay those specific rates for the length of the two-year contract when On Site agreed to pay $150,000 to settle PSI's lawsuit. Indeed, there is no evidence that the parties even discussed specific rates at that time.  Metzler admits that he knew Affable charged lower rates than On Site when the Agreement was signed, (ECF No. 50-2 at 33:14–22), but there is no indication Metzler misrepresented that fact to On Site.  *See First Union Nat. Bank v. Steele Software Sys. Corp.*, 838 A.2d 404, 434 (Md. Ct. Spec. App. 2003) ("A possible motive for committing a fraud, however, does not prove fraudulent intent.").  Not only is there no indication that Metzler misrepresented that fact, On Site's President Nguyen acknowledges that although he knew Affable was providing C-Care with temporary staff, he did not inquire about its rates with C-Care.  (ECF No. 48-5 at 30:5–31:8, 42:11–21).  Nor did Nguyen consult his lawyer before signing the Agreement.

Moreover, even if Metzler had an undisclosed ownership or control interest in Affable and that interest was legally actionable, Nguyen was on notice of that alleged fact *prior* to agreeing to pay the $150,000.  On Site relies in large part on a text from C-Care employee Kevin Miller to Nguyen in which Miller stated he was "sure [Metzler] owns Affable."  (ECF No. 50-12).  That text was on March 17, 2013, five days before the parties agreed to the $150,000 payment in exchange for the two-year contract.  (ECF No. 50-4) (The Letter of Intent dated March 22, 2013 that confirmed the "agreement in principle reached today between C-Care, LLC and On-Site Personnel, Inc.").  Despite Miller's text, however, Nguyen did not ask Metzler or

any C-Care agent about its relationship with Affable during their negotiations that culminated in the March 22 Letter of Intent.  Nguyen's lack of inquiry on this subject despite his knowledge parallels his failure to question C-Care about Affable's rates; both are further impediments to On Site proving fraudulent inducement by clear and convincing evidence.

In conclusion, no reasonable fact-finder could infer that C-Care fraudulently induced On Site to pay the $150,000 to settle PSI's lawsuit.  Accordingly, C-Care's motion for summary judgment will be granted as to Count III.

### C. Unjust Enrichment.

On Site's final claim against C-Care is that it was unjustly enriched by On Site's payment of $150,000 to settle PSI's lawsuit (Count IV).  On Site alleges that C-Care was benefitted by that payment, understood it was in return for a two-year contract, and that by retaining the benefit without performing under the Agreement it has been unjustly enriched.  The parties dispute precisely what On Site is claiming, but under either interpretation summary judgment in C-Care's favor is warranted.

First, if On Site's unjust enrichment claim arises from C-Care's alleged breach of the Agreement, it is barred under Maryland law.  *See, e.g.*, *Cnty. Comm'rs of Caroline County v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 607–10 (Md. 2000) (citing and affirming the "general rule . . . that no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claims rests") (internal citation marks omitted).  Here, Metzler admits he understood that On Site's $150,000 payment was made in exchange for a two-year, 50% staffing contract with C-Care.  (ECF No. 50-2 at 27:11–19).  Because On Site and C-Care signed the Agreement that is now being litigated over, On Site cannot recover under an unjust enrichment theory that is based on an alleged breach of

contract.  Moreover, as discussed above, the evidence establishes that the promise was a two-year contract in exchange for the $150,000 settlement money.  The parties signed the Agreement to that effect, and only after a dispute arose over paragraph 7.a regarding rates did the relationship break down.  On Site was paid for about eight months of services under that Agreement.

Second, if On Site's unjust enrichment claim relates instead to the benefit conferred upon C-Care in settling PSI's lawsuit, summary judgment is still warranted.  The reason is simple: On Site also benefitted from its own $150,000 payment.  The primary purpose of the money was to settle PSI's lawsuit, which named both C-Care and On Site as defendants.  Both benefited from settlement, therefore, by avoiding future litigation costs and potential damages awards.  C-Care did not retain the $150,000, it used it for both parties' benefit as agreed.

C-Care's motion for summary judgment as to Count IV of the amended complaint, therefore, is granted.[4]

## II.  Claim against Metzler.

Count II of On Site's amended complaint alleges that Metzler tortiously interfered with the contract between On Site and C-Care.[5]  On Site alleges that Metzler "intentionally, improperly, and with actual malice . . . induced C-Care to breach the [contract with On Site] by, among other things, creating false payment records showing lower staffing rates . . . and by actively recruiting On Site's employees."  (ECF No. 26 ¶ 31).  On Site's claim fails for two reasons: Metzler is not an outside third party to the contract as required under Maryland law; and On Site has not cited any evidence demonstrating improper or malicious conduct by Metzler.

---

[4] Because summary judgment is granted to C-Care on all of On Site's substantive allegations, summary judgment is also granted as to Count V of its complaint, seeking declaratory judgment.
[5] Count II is also against Affable and Kunga, but neither joined the pending motion for summary judgment.

### A. Metzler is not a third party.

Under Maryland law, a third party who intentionally interferes "with another in his or her business or occupation [that] induces a breach of an existing contract" is liable for tortious interference of contract. *Macklin v. Robert Logan Assoc.*, 639 A.2d 112, 117 (Md. 1994). As the description of the tort makes clear, the alleged tortfeasor must be independent from the contract and not a party to it. *See, e.g.*, *Continental Cas. Co. v. Mirabile*, 449 A.2d 1176, 1185 (Md. Ct. Spec. App. 1982) ("Recovery is not permitted . . . where the defendant is a party to the contract.") (citing *Wilmington Trust Co. v. Clark*, 424 A.2d 744, 754 (Md. 1981)). Here, Metzler cannot be liable for tortious interference because during all relevant times he was acting as President of C-Care—a party to the contract.

This fact is undisputed. For example, Metzler and Davis discussed via internal C-Care email the exact Affable rates that they were going to present to Nguyen. (ECF No. 50-6). Also, when Nguyen was asked in his deposition whether "C-Care advised you that they were paying Affable a lower rate than what you were charging," Nguyen answered that he "was called for a meeting and at that time Ulrich [Metzler] wanted me to lower my rate. He presented to me a new rate, you know." (ECF No. 48-5 at 43:14–19). On Site has not cited any evidence that disputes these facts or casts doubt on whether Metzler was acting as President (and thus an agent) of C-Care.[6] As a matter of law, therefore, Metzler was not an outside third party attempting to sabotage a contract between two independent parties, and cannot be liable for contract interference.

---

[6] On Site also argues that there is a genuine dispute as to whether Metzler had control or ownership over Affable as discussed in Part I.A.2, *supra*. Even if that fact was genuinely disputed, the evidence demonstrates that Metzler's role in the decisions made by C-Care regarding its contract with On Site was as President of C-Care, not as an agent of Affable.

**B.  There is no genuine dispute over whether Metzler acted maliciously.**

On Site also claims that Metzler interfered with the contract by falsifying the records of Affable's rates and by "actively recruiting On Site's employees" to sign with Affable.  Even assuming *arguendo* that Metzler was a third party acting outside the scope of his employment at C-Care, On Site has not cited sufficient evidence to withstand its burden in opposing Metzler's motion for summary judgment.

First, although On Site disputes the validity and credibility of the documents produced by C-Care to prove Affable's rates, On Site has not cited contrary evidence that disputes the documents.  As discussed above in Section I.A.2, *supra*, On Site received an August 18, 2013 invoice from Affable, redacted timesheets, and a handwritten check stub.  (ECF No. 50-11).  The invoice is corroborated by the contents of the June 21, 2013 email sent by Metzler to Davis in which they confirmed Affable's rates that they were going to present to Nguyen.  The only evidence offered by On Site in response is the testimony of Nguyen which, even if sincere, does not dispute the authenticated and corroborated documents produced by C-Care.  Moreover, even if the rates were falsified, On Site has not cited evidence directly implicating Metzler.  Accordingly, it is undisputed that Metzler did not "create[] false payment records showing lower staffing rates."  (ECF No. 26 ¶ 31).

Second, On Site's allegation that Metzler "actively recruit[ed] On Site's employees" to leave and join Affable does not create liability under these facts.  It is true that C-Care Plant Manager Kevin Klasmeyer, after discussions with Metzler, asked C-Care's shift supervisors to identify On Site employees who could be recruited by Affable.  (ECF Nos. 40-18; 50-18 at 40:22–41:3).  These undisputed facts confirm Metzler had a role in recruiting On Site's employees, but his actions (and Klasmeyer's) occurred in December 2013, well after C-Care

deemed On Site to be in breach of the Agreement as of September 4, 2013.[7]  By December,

therefore, both parties considered the contract to be breached.  In addition, there is no evidence

that the contract prohibited soliciting On Site's employees to work for a different temporary

staffing service.  *Cf. Fowler v. Printers II, Inc.*, 598 A.2d 794, 802 (Md. Ct. Spec. App. 1991)

("[T]here was a valid, enforceable covenant that restricted Fowler from soliciting the customers

of Printers.").  Nor has On Site cited any case law prohibiting Metzler's conduct even in the

absence of a non-compete clause.

        In conclusion, Metzler was acting as President of C-Care during the conduct complained

of by On Site, the undisputed facts establish that Affable's rates were legitimate, and Metzler's

role in soliciting On Site's employees was not contrary to a contract provision or Maryland law.

Accordingly, Metzler's motion for summary judgment as to himself is granted.

## CONCLUSION

        Beneath the allegations and arguments made by both sides, this case is about a favorable

clause inserted into the Agreement by C-Care on which Nguyen did not seek clarification or

legal counsel.  When confronted by C-Care, On Site refused to comply and filed this lawsuit.

Based on the facts as cited by the parties, On Site cannot meet its burden of proof at trial as to its

claims against C-Care and Metzler.  Accordingly, their motion for summary judgment is granted.


_____05/06/2015_____                    _____/s/_____
Date                                          J. Frederick Motz
                                              United States District Judge

_____

[7] C-Care continued to utilize temporary staffing from On Site until the end of 2013, but that was
due to no available alternatives.  Once Affable was able to provide sufficient staff to cover all of
C-Care's need, C-Care ceased its relationship with On Site.